IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SANDRA CONNELLY,<br><br>Plaintiff,<br><br>v.<br><br>LANE CONSTRUCTION CORPORATION,<br><br>Defendant. | Civil Action No.<br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

## I. INTRODUCTION

1.  Plaintiff Sandra Connelly ("Connelly" or "Plaintiff") was the only female truck driver employed by Defendant Lane Construction Corporation ("Lane" or "Defendant") from her hire in or around May 2006 until she was laid off in or around October 2010 and not recalled to work in or around April 2011 for that construction season. Connelly's supervisors at Lane subjected her to disparate treatment based on her gender, sexual harassment from co-workers and a Lane supervisor, a hostile work environment, and retaliation for making complaints about discrimination and sexual harassment.

2.  After Connelly made numerous complaints about discrimination, harassment, and safety to a Lane "ethics line," Lane manipulated its procedures for recalling truck drivers to work following a lay off and skipped over Connelly to recall the two male employees below her in seniority. Connelly was not recalled to work in 2011 or thereafter.

3.  By subjecting Connelly to discrimination and a hostile work environment based on her gender and retaliation because she complained about disparate treatment, Defendant Lane

Construction Corporation violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et. seq. ("Title VII"), and the Pennsylvania Human Relations Act, 43 P.S. §§ 951 et. seq. ("PHRA").

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331 and § 1343, and supplemental jurisdiction over her related state law claims under 28 U.S.C. § 1367.

5. Since all of the violations alleged occurred in Allegheny County, venue is proper in the Western District of Pennsylvania under 28 U.S.C. § 1391.

## III. PARTIES

6. Plaintiff Sandra Connelly is a 43 year-old female who resides in Pittsburgh, Pennsylvania. Connelly is an experienced truck driver. She was hired by Lane Construction Corporation in May 2006 and worked during the construction seasons—typically from March or April until October or November—until October 2010 when she was laid off. Lane did not recall Connelly in April 2011 when her truck-driver co-workers were recalled. At all times relevant to this case, Connelly was an "employee" of Defendant within the meaning of Title VII and the PHRA.

7. Defendant Lane Construction Corporation is a heavy highway and civil construction company incorporated in Connecticut and headquartered in Cheshire, Connecticut. Lane constructs highways, bridges, locks and dams, mass transit and airport systems in 20 states and employs approximately 4,000 people. At all times relevant to this case, Lane Construction Corporation was an "employer" within the meaning of Title VII and the PHRA.

## IV.   FACTS

8. Lane hired Connelly to be a truck driver at its Pittsburgh plant location in or around May 2006.

9. Pursuant to the union-security clause in Lane's Collective Bargaining Agreement with Teamster's Local Union No. 341, Connelly became a member of the Teamster's Local.

10. During Connelly's tenure, Lane employed seven (7) truck drivers from the Teamster's Local at the Pittsburgh plant location. Of those seven (7) drivers, Connelly ranked fifth (5th) in seniority.

11. Connelly was the only female truck driver employed by Lane at the Pittsburgh plant location from May 2006 until October 2010.

12. On information and belief, Lane has not employed any other female truck drivers from October 2010 until the present at the Pittsburgh plant location.

13. When Connelly was hired in or around May 2006, she was involved in an open and known romantic relationship with co-worker and fellow Teamster truck driver, Mark Nogy ("Nogy").

14. Connelly ended her relationship with Nogy in or around May 2007.

15. After Connelly ended the relationship, Nogy began making disparaging comments about her on job sites and interfered with Connelly's job duties.

16. In one instance, Nogy blocked Connelly's truck from being able to leave the "company yard" where the trucks were kept. Connelly asked a co-worker, Joe Monstrola, to have Nogy move out of the way. Nogy responded to Monstrola that Connelly was an "asshole."

17. Connelly reported this incident to supervisor Jeremy Hostetler.

18. Hostetler told Connelly that Nogy denied blocking her truck and calling her an "asshole" and Hostetler declined to make any further inquiries into the incident despite Connelly providing the names of two (2) co-workers who witnessed the incident.

19. Connelly also complained to Hostetler about Nogy's ongoing harassing comments.

20. After May 2007, Connelly endured continuous harassment from other Lane co-workers as well. The other truck drivers cursed at Connelly and belittled her on a daily basis.

21. Some male truck drivers refused to speak directly to Connelly, even when the job required communication. Instead, these drivers insisted on communicating with Connelly through intermediaries, making it difficult for Connelly to complete her job duties.

22. Lane employee Ed Casciato ("Casciato") told Connelly in the summer of 2007 that Nogy's comments about her were increasingly frequent and disparaging. Casciato told Connelly that he complained to a Lane executive, Charlie Ames ("Ames") about Nogy's treatment of Connelly.

23. After learning about Nogy's comments to other co-workers from Casciato, Connelly again described the hostile treatment she was experiencing to Hostetler.

24. Connelly also approached Tim Holleran, another Lane supervisor, who told her that the problem with Nogy was being investigated by "the attorneys in Connecticut" (presumably referring to individuals at Lane's headquarters). He told Connelly that it would take some time to respond to her complaints.

25. Connelly contacted the Connecticut office herself, and she was informed that they had not received any information about her complaints of a hostile working environment or discrimination and that her phone call was the first time they had heard about it.

26. The morning after Connelly's phone call to Lane's headquarters, she was called to a meeting with Ames and Mike Hindt, another Lane executive.

27. Hindt asked Connelly, "How do you want me to handle this?"

28. Connelly responded that she did not know and asked Hindt how Lane usually addressed this type of problem. She provided Hindt and Ames with the names of several co-workers who had witnessed Connelly being harassed.

29. Nogy was suspended for three (3) days following the meeting, but on information and belief, no other Lane employees were disciplined or warned for their discriminatory treatment of Connelly at that time.

30. After Lane suspended Nogy, Connelly continued to be harassed and disparaged by her co-workers, particularly by some of the other male truck drivers.

31. On one occasion after Nogy's suspension, Connelly overheard a conversation between other truck drivers on her CB radio. A non-Lane truck driver on the radio asked, "where's that good-looking blonde lady who drives for Lane?" and Lane employee Gary Renk responded, "that bitch should be fired."

32. During the summer 2008 construction season, Connelly was nearly hit by another truck driver, Monstrola, as she was disconnecting a trailer in the company yard. Monstrola had failed to check if the trailer was still attached before moving the truck.

33. Immediately after the near collision with Connelly, Monstrola exited the truck with an open beer bottle in his hand. Connelly reported the incident to Hostetler who laughed and agreed that he was aware that some of Connelly's male co-workers drank alcohol at the company yard.

34. On information and belief, Hostetler did not make a report of the near collision and Monstrola's alcohol consumption or question or reprimand Monstrola after Connelly's complaint about the incident.

35. Sometime in early 2009, Connelly became aware of an "Ethics Line" for employees to report job-related complaints to Lane.

36. Connelly contacted the Ethics Line initially in 2009 to report further harassing treatment from Nogy. She made subsequent complaints throughout that summer about her male co-workers drinking on the job.

37. An Ethics Line representative at Lane encouraged Connelly to call back anytime she witnessed drinking on the job, which Connelly did repeatedly as the drinking persisted.

38. Connelly contacted the Ethics Line numerous times in 2009 to report both drinking on the job and discriminatory treatment due to her gender and her previous complaints about the hostile work environment.

39. In or around May 2010, Connelly was sexually harassed by Lane Foreman George Manning ("Manning"), who threatened Connelly with unwanted physical contact.

40. Manning came close to Connelly and told her, "one day I'm going to kiss you."

41. Connelly backed away from Manning shaking her head and saying, "No."

42. Connelly called the Ethics Line a few days later to report the incident with Manning.

43. After the incident with Manning, Connelly asked Hostetler to transfer her to a different job site, telling him that she was uncomfortable working with Manning after his conduct towards her.

44. Hostetler told Connelly that he could not believe Manning would "do something like that" and told Connelly he wanted to meet with the two of them together. A meeting between Manning, Connelly, and Hostetler never occurred.

45. After Connelly made another call to the Ethics Line about the situation, Hostetler finally agreed to transfer Connelly to another job site.

46. Connelly's relationship with Hostetler and the male truck drivers became increasingly strained throughout 2010, and Connelly made numerous complaints to the Ethics Line and directly to Lane management at the Pittsburgh Plant.

47. In October 2010, Hostetler became incensed when Connelly refused to drive a truck that had a flat tire and problems with the steering. He asked her—threatening—"are you refusing work?"

48. Connelly tried to calmly explain that she could not safely operate the truck. When Hostetler persisted in berating Connelly, she contacted Ames who told her to leave the job site.

49. Shortly thereafter, Connelly was laid off. Her lay off came before any of the other truck drivers were laid off at the end of the season, despite her seniority.

50. Lane has never recalled Connelly to work.

51. On information and belief, all six (6) of Connelly's truck driver co-workers were recalled in 2011 and still remain employed by Lane.

52. In or around April 2011, Connelly called Ames to ask why she had not been recalled. Ames responded that the economy was bad and no work was available.

53. Connelly passed by Lane jobsites in or around April and May 2011 and saw all six (6) of her truck driver co-workers working for Lane in some capacity.

54. After observing her co-workers working, Connelly again called Ames to ask why Teamster truck drivers with less seniority had been recalled before her.

55. Ames informed Connelly that one truck driver, Mike Rupart ("Rupart"), the truck driver with the least seniority, was permitted to come back to work as a general laborer.

56. Ames' justification for Rupart being permitted to work as a laborer was that Rupart said he needed to work. No such arrangement or exception was offered to Connelly.

57. Connelly also asked Ames why Casey Allen ("Allen"), another Teamster truck driver with less seniority than Connelly, had been recalled before her.

58. Ames responded that Allen was called back to operate the "tack" truck because Connelly was not trained on that truck.

59. Prior to the 2011 construction season, the most senior truck driver, Donny Smail, had been the primary "tack" truck operator.

60. Connelly asked Ames why Smail was not driving the "tack" truck. He responded that Smail was "senior man—he can choose what he drives."

61. Contrary to Ames' response, Lane had not permitted truck drivers to choose which truck they operated based upon seniority and the collective bargaining agreement provides the following:

> Drivers in accordance with their qualifications and seniority shall be offered the highest rate classification of work but cannot choose their equipment or work assignments.

62. Connelly also reported to Ames and to the Teamster's Local that she observed non-Teamster truck drivers working at Lane jobsites in early 2011.

63. Connelly is qualified to operate all trucks used by Lane except for the "tack" truck, and she had routinely operated all other trucks for Lane.

64. Lane purposefully manipulated its truck driver recall process to exclude Connelly in early 2011.

65. Between 2006 and 2010, Lane had always recalled truck drivers in order of their seniority with the Company.

66. Connelly filed a union grievance against Lane and an informal arbitration was held in July 2011.

67. Following the informal arbitration, Connelly received a one-sentence decision from the Teamster's Local denying the grievance in or around July 2011.

68. Connelly timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 7, 2010 that was dual-filed with the Pennsylvania Human Relations Commission ("PHRC").

69. Lane submitted a position statement to the EEOC on May 9, 2013.

70. In its position statement, Lane referenced a three- (3-) page decision it received after the informal arbitration regarding Connelly's grievance in or around July 2011.

71. Connelly was not given the full informal arbitration decision until she repeatedly requested a copy of it from Teamster's Local 341 in or around July 2013.

72. In its May 9, 2013 position statement, Lane also falsely reported to the EEOC that Connelly is only qualified to operate a water truck and broom truck.

73. In its May 9, 2013 position statement, Lane also falsely reported that Lane did not utilize a water truck on the "Route 8 project" in early 2011 and that no truck positions for which Connelly was qualified were then available or have since become available.

74. Throughout the summer construction season in 2011, Connelly observed Lane truck drivers operating a water truck and several other trucks she is qualified to operate.

75. Specifically, Connelly witnessed Richie Konovich and Smail operating the water truck in or around May 2011.

76. Connelly also witnessed Casey Allen—who had less seniority than Connelly—operating the "tack" truck in or around May 2011.

77. The EEOC issued a Notice of Right to Sue on June 28, 2013.

78. It has been over one (1) year since Connelly's Charge was dual-filed with the PHRC.

79. Connelly has exhausted her federal and state administrative remedies.

## V.   CAUSES OF ACTION

### Count I – Violations of Title VII

80. The foregoing allegations are incorporated as if set forth in their entirety.

81. The conduct of Lane and its supervisors as described above subjected Connelly to disparate treatment in the terms and conditions of her employment on the basis of her gender, unreasonably interfered with her ability to perform her job, and created an intimidating, humiliating, and hostile work environment in violation of Title VII.

82. The conduct of Lane and its supervisors in treating Connelly less favorably than similarly situated male co-workers violates Title VII.

83. By retaliating against Connelly for opposing conduct made unlawful under Title VII, Lane violated Title VII.

84. As a result of Lane's conduct, Connelly lost wages and other emoluments of employment, and suffered from severe emotional distress, anxiety, mental anguish, and humiliation.

85. As a construction corporation with over 4,000 employees operating in twenty (20) states, Lane understood or should have understood its legal obligations. Lane's conduct was willful in that it either knew or showed reckless disregard for whether its conduct was prohibited by Title VII by proffering a false and pretextual reason for not recalling Connelly to work in 2011, or thereafter, and by attempting to cover up the discrimination by making false and misleading statements to the EEOC such that the imposition of punitive damages is appropriate.

### Count II – Violations of the Pennsylvania Human Relations Act

86. The foregoing allegations are incorporated as if set forth in their entirety.

87. Based on the foregoing, in subjecting Connelly to disparate treatment and a hostile environment based on her gender, and retaliating against her for opposing conduct made unlawful under the PHRA, Lane violated the PHRA.

88. As a result of Lane's violations of the PHRA, Connelly lost wages and other emoluments of employment; and she has suffered from severe emotional distress, anxiety, mental anguish, and humiliation.

### VI. PRAYER FOR RELIEF

WHEREFORE Plaintiff requests that the Court:

a) Assume jurisdiction of her case;

b) Find and declare that the Defendant discriminated against Plaintiff in the terms, conditions, rights and privileges of her employment in violation of Title VII of the Civil Rights Act of 1964, and enjoin such further conduct by the employer;

c) Find and declare that the Defendant discriminated against Plaintiff in the terms, conditions, rights and privileges of her employment in violation of the Pennsylvania Human Relations Act and enjoin such further conduct by the employer;

d) Award Plaintiff such back pay, front pay, employment benefits and all other emoluments of employment as if the discharge had not occurred;

e) Award Plaintiff compensatory and consequential damages and punitive damages;

f) Award Plaintiff such costs and expenses of suit, and reasonable attorneys' fees, expert witness costs, and such other relief as the Court deems necessary and proper after trial of this matter;

g) Find for the Plaintiff and against the Defendant on all counts of this Complaint; and

h) Order such other and further relief as may be deemed just and proper.

Respectfully submitted,

Dated:  September 26, 2013      /s/Emily Town
Emily E. Town
PA ID No. 309881
etown@stembercohn.com
**STEMBER COHN &
      DAVIDSON-WELLING, LLC**
429 Forbes Avenue
1616 Allegheny Building
Pittsburgh, PA  15219
T.: (412) 338-1445
F.: (412) 338-1446

*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SANDRA CONNELLY,<br><br>        Plaintiff,<br><br>   v.<br><br>LANE CONSTRUCTION CORPORATION,<br><br>        Defendant. | Civil Action No.<br><br><br><br>JURY TRIAL DEMANDED |

### JURY TRIAL DEMAND

Plaintiff demands trial by jury on all claims so triable in the above-captioned action.

                                                Respectfully submitted,

Dated:  September 26, 2013        /s/Emily Town
                                                Emily E. Town
                                                PA ID No. 309881
                                                etown@stembercohn.com
                                                **STEMBER COHN &**
                                                        **DAVIDSON-WELLING, LLC**
                                                  429 Forbes Avenue
                                                1616 Allegheny Building
                                                Pittsburgh, PA  15219
                                                T.: (412) 338-1445
                                                F.: (412) 338-1446

                                                *Attorneys for Plaintiff*